IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Magistrate Judge Maritza Dominguez Braswell**

Civil Action No. 21–cv–01396–MDB

ALEXANDRIA R. SANCHEZ,

      Plaintiff,

v.

PUEBLO COUNTY SCHOOL DISTRICT #70, a Colorado government agency,

      Defendant.

---

## MEMORANDUM AND ORDER

---

This matter is before the Court on "Defendant's Motion for Summary Judgment."
(["Motion"], Doc. No. 24.) Plaintiff has responded in opposition to the Motion for Summary
Judgment, and Defendant has replied. (["Response"], Doc. No. 32; ["Reply"], Doc. No. 34.) The
parties have consented to proceed before a United States magistrate judge for all purposes,
including the entry of a final judgment under 28 U.S.C. § 636(c). (Doc. No. 12; *see* Doc. No.
15.) After considering the pleadings, the evidence submitted, and the applicable law, the Motion
for Summary Judgment is **GRANTED in part**, and **DENIED in part**.

### STATEMENT OF THE CASE

Plaintiff Alexandria Sanchez ["Ms. Sanchez"] brings this employment discrimination
lawsuit against Defendant Pueblo County School District #70 ["PCSD," or "the District"],
alleging violations of Title VII of the Civil Rights Act of 1964, as amended ["Title VII"], 42

U.S.C. §§ 2000(e) *et seq.*, the Age Discrimination in Employment Act of 1967 ["ADEA"], 29

U.S.C. § 621 *et seq.*, and the Colorado Anti-Discrimination Act ["CADA"], Colo. Rev. Stat. §§

24-34-402 *et. seq.*.

## I.    Material Facts Pertinent to the Resolution of the Motion for Summary Judgment

The following facts are undisputed unless otherwise noted. PCSD is a Colorado public

school district. (Doc. No. 6 at 2 ¶ 5; Doc. No. 11 at 2 ¶ 5.) Ms. Sanchez—who is over forty years

of age and identifies and presents as mixed race of Hispanic, Native American, and Caucasian—

has been employed by PCSD, off and on, since 2015, primarily as either a substitute or

temporary teacher. (Doc. No. 24 at 4 ¶¶ 11-12; Doc. No. 32 at 4 ¶¶ 11-12.)

### A. PCSD's Hiring Process

PCSD is bound by the terms of a collective bargaining agreement between itself and the

Pueblo County Association [the "Negotiated Agreement"]. (Doc. No. 24 at 2 ¶ 1; Doc. No. 32 at

3 ¶ 1; *see* Doc. No. 24-1 at 3.) The Negotiated Agreement sets forth the hiring process that PCSD

must follow to fill teaching vacancies. (*Id.*) Pursuant to the Negotiated Agreement's terms,

teachers currently employed by the District who apply for open teaching positions for which they

are qualified ["Level 1 candidates"][1] are given preferential consideration as against all other job

applicants ["Level 2 candidates"]. (Doc. No. 24 at 2 ¶¶ 2-3; Doc. No. 32 at 3 ¶¶ 2-3.) Level 1

candidates who apply to fill a teaching vacancy are guaranteed an interview for the position. (*Id.*)

Only if the vacancy remains unfilled after all Level 1 candidates have been interviewed, *i.e.* no

---

[1] An applicant is "highly qualified" if they hold a Colorado Department of Education license in
the content area related to the position they are seeking. (Doc. No. 32-1 at 2.) It is unclear from
the record whether there is any meaningful distinction between "qualified" and "highly qualified"
candidates.

Level 1 candidate is chosen for the position, are Level 2 candidates then screened based on their qualifications and particular program needs. (*Id.*) Current PCSD employees with Intent Not to Renew ["INR"] contracts,[2] temporary contracts, or nonrenewed contracts are considered Level 2 candidates for vacancies that arise after the completion of the contract work or June 1st, whichever is earliest. (Doc. No. 24 at 2 ¶ 4; Doc. No. 32 at 3 ¶ 4.)

The Negotiated Agreement includes detailed processes for interviewing Level 1 and Level 2 candidates. (Doc. No. 24 at 2-3 ¶ 6; Doc. No. 32 at 3 ¶ 6.) In compliance with these terms, every PCSD school forms its own interview committee to evaluate candidates for teaching vacancies that arise at that particular school. (*Id.*) The interview committee, which is composed of four to eight current employees at the school, is tasked with formulating a standardized set of identical questions to be asked of all candidates who interview for the position, and also with making post-interview recommendations for hiring. (Doc. No. 24 at 2-3 ¶¶ 6-7; Doc. No. 32 at 3 ¶¶ 6-7.)

The particular employees who sit on a school's interview committee varies with each vacancy, depending on employee availability and the type of position that is being filled. (Doc. No. 24 at 3 ¶ 7; Doc. No. 32 at 3 ¶ 7.) The interview committee is led by the school's principal, who submits the committee's final recommendation to the District for formal approval at the next school board meeting. (Doc. No. 24 at 3 ¶ 6; Doc. No. 32 at 3 ¶ 6.) Although formal approval by the District's school board must occur, the decision to hire someone to fill a

---

[2] INR positions arise due to, among other things, increased school enrollment, budgetary reasons, or leaves of absence taken by tenured PCSD teachers. (Doc. No. 24 at 3 ¶ 8; Doc. No. 32 at 3 ¶ 8.) INR positions are often not renewed or turned into permanent positions. (*Id.*)

particular teaching vacancy ultimately lies with the individual school's principal and interview committee. (*Id.*)

PCSD's interview process for filling teaching vacancies is designed to provide all applicants with a fair and equal opportunity. (Doc. No. 24 at 3 ¶ 9; Doc. No. 32 at 4 ¶ 9.) In addition to qualifications for the position, the District also takes into consideration the whole individual during the interview process. (*Id.*) A candidate can be more qualified, but not do as well in the interview, such that a lesser-qualified candidate is hired instead. (*Id.*)

**B. Ms. Sanchez's Employment History with PCSD**

In 2011, Ms. Sanchez applied for two teaching vacancies within the District, first, as an Anticipated Language Arts and Social Studies Generalist at Connect Charter School, and then, as an elementary school teacher at Prairie Winds Elementary School. (Doc. No. 6 at 6 ¶ 27; Doc. No. 11 at 5-6 ¶ 27.) It is unclear from the record whether these were full-time positions, permanent positions, both, or neither. Despite being qualified, Ms. Sanchez was not hired for either position.[3] (*Id.*; Doc. No. 32-2 at 1.)

In 2015, Ms. Sanchez applied for either fifteen or sixteen teaching vacancies at PCSD schools, at least some of which were full-time positions. (Doc. No. 6 at 6 ¶ 28; Doc. No. 11 at 6 ¶ 28.) Ms. Sanchez was ultimately hired by the District, in March 2015, for a substitute teaching position at Swallows Charter Academy K-12. (Doc. No. 6 at 5 ¶ 23; Doc. No. 24 at 4 ¶ 12.) Despite being qualified, Ms. Sanchez was not hired for any full-time or permanent teaching

---

[3] Ms. Sanchez testified that she was qualified for every PCSD teaching position to which she applied. (Doc. No. 32-2 at 1.) Neither Ms. Sanchez, nor PCSD, has produced evidence regarding Ms. Sanchez's specific qualifications or lack thereof for the teaching positions at issue in this case.

positions to which she applied that year. (Doc. No. 6 at 6-7 ¶ 28; Doc. No. 11 at 6 ¶ 28; Doc. No. 32-1 at 1.)

In 2016, Ms. Sanchez applied for approximately seven teaching vacancies within the District. (Doc. No. 6 at 7 ¶ 29; Doc. No. 11 at 6 ¶ 29.) It is unclear from the record how many of the positions, if any, were full-time or permanent positions. In February 2016, Ms. Sanchez accepted an assignment as a long-term substitute teacher at Liberty Point Elementary School ["LPE"]. (Doc. No. 24-6 at 2.) She held that position through the end of the school year. (*Id.*) For the 2016-2017 school year, Ms. Sanchez was hired for an INR position as a first-grade teacher at LPE. (Doc. No. 24 at 4 ¶ 12; Doc. No. 32 at 4 ¶ 12.) The record shows that the INR position was not renewed. (*Id.*)

At the beginning of the 2016-2017 school year, on August 22, 2016, Ms. Sanchez sent an email to a PCSD personnel employee, Jeanne Baldwin ["Ms. Baldwin"], with the subject line "concerns with applications." (Doc. No. 24-6 at 15.) The email read, in pertinent part, as follows:

> I am a licensed teacher who has been substituting in [PCSD] schools since March 2015[.] . . . I would love the opportunity to teach full time in a [PCSD] elementary school. However, none of the applications I have submitted this past spring and summer resulted in an interview.
>
> Is it possible to schedule an appointment to meet with you or a representative of [PCSD] Personnel Services to identify problems with my application, credentials, references, etc.?
>
> I appreciate your time and attention to this email, and I thank you for any help that you are willing to provide.

(*Id.*) Later that same day, Ms. Baldwin responded to Ms. Sanchez's email, copying PCSD Director of Personnel Andy Beeman ["Mr. Beeman"] to the correspondence. (*Id.* at 16.) The substance of Ms. Baldwin's response read as follows:

> [Your] application and uploads in general look great. Off the top of my head, I know Mr. DiPietro was very interested in having you interview for a Spanish position last year and you declined the interview, so my guess is the issue might be more about timing and finding the right fit. Something I always like to mention to outside applicants is not to get discouraged because we have a few unique situations in the district that can make it feel like it is hard to get your "foot in the door." First, we are governed by a negotiated agreement that implements two applicant levels for interviewing. Anyone currently working in a permanent position with [PCSD] and highly qualified for the position is guaranteed an interview. With that being said, [PCSD] is so spread out that there are a lot of employees [with long commutes] . . . [that are] hoping to secure a [more centrally located] position. What that means is the majority of our positions never make it to Level II [candidates] and it can create quite a ripple effect until internal movement settles down. I highly encourage you not to get discouraged and continue applying for positions you are qualified for and interested in.

(*Id.*) Ms. Sanchez emailed Ms. Baldwin the next day, thanking her for the "informative and encouraging reply." (*Id.* at 17.)

In 2017, Ms. Sanchez applied for approximately fifteen teaching vacancies at PCSD schools. (Doc. No. 6 at 7 ¶ 29; Doc. No. 11 at 6 ¶ 29.) It is unclear from the record how many of the positions, if any, were full-time or permanent positions. At the end of the 2016-2017 school year, Ms. Sanchez contacted Mr. Beeman, inquiring as to why she was "having a hard time getting hired." (Doc. No. 24-6 at 10.) After apparently receiving no response, on September 8, 2017, Ms. Sanchez sent an email to Mr. Beeman, the entirety of which reads:

> Dear Mr. Beeman,
>
> It has been over three weeks since you stated that you would send me a copy of my RANDA evaluation for 2016-17. I am perplexed as to why there seems to be a delay. I know that I received only positive evaluations of proficient or above for all of my evaluations including my "measures of student learning/outcomes." I am sorry that I did not make copies of the evaluations along the way. All I can say is that it was a very busy year professionally and personally. I am certain that you understand how important it is for me to have my own record of my positive 2016-17 RANDA evaluations.

This year, I have applied to at least ten positions in [PCSD]. Unfortunately, I have only been allowed to interview for one position! I know that [PCSD] is supposed to be an "Equal Opportunity Employer," so something is wrong. I need my RANDA evaluations for 2016-17 as positive support in my search for employment. I don't know if I am not getting a positive recommendation from Mrs. Vincent, or if there is some other explanation for my lack of teaching opportunities in my home community Pueblo School District 70. I know that I did a good job last year, especially considering many negative factors that were outside of my control. I can provide students, parents, and staff members who support this fact.

I would like to schedule a meeting to discuss this matter and identify any problems with my applications, credentials, work history, references, or anything else that is making it difficult to continue my career in education. I understand that you are very busy, but please grant me some form of communication. Thank you.

Respectfully,

Alexandria R. Sanchez

(Doc. No. 32-5 at 6.) At the time that Ms. Sanchez sent this email to Mr. Beeman, she "wondered" whether she was being discriminated against. (Doc. No. 24-6 at 11.) The record shows that PCSD did not understand Ms. Sanchez's email to imply that she was concerned about potential discrimination. (Doc. No. 24-1 at 7; Doc. No. 24-7 at 2.) After sending her email to Mr. Beeman, Ms. Sanchez continued to work for PCSD, as a substitute teacher, for the remainder of the 2017-2018 school year. (Doc. No. 24-6 at 2.)

In 2018, Ms. Sanchez applied for approximately fifteen teaching vacancies at PCSD schools. (Doc. No. 6 at 7 ¶ 29; Doc. No. 11 at 6 ¶ 29.) It is unclear from the record how many of the positions, if any, were full-time or permanent positions. Ms. Sanchez was ultimately hired, in October 2018, to work as an INR kindergarten teacher for the remainder of the 2018-2019 school year. (Doc. No. 24 at 4 ¶ 12; Doc. No. 32 at 4 ¶ 12.) The INR position was not renewed. (*Id.*)

Meanwhile, in September 2018 or thereabouts, Ms. Sanchez met with Mr. Beeman to discuss her "concerns" regarding her employment applications. (Doc. No. 24-6 at 11, 18.) The

meeting was held in Mr. Beeman's office and three other employees from the District's personnel department were in attendance. (*Id.* at 11.) During the meeting, Ms. Sanchez questioned why she was not getting selected for interviews, "especially to positions that were not INR." (*Id.*) Mr. Beeman, in response, assured Ms. Sanchez that "everything seems fine, there's no black cloud hanging over your head." (*Id.*) Ms. Sanchez did not verbalize any concerns about discrimination during this meeting. (*Id.*)

In 2019, Ms. Sanchez applied for twelve teaching vacancies at PCSD schools. (Doc. No. 34-1 at 1.) Seven of the positions to which Ms. Sanchez applied were full-time and/or permanent positions; the remainder were INR positions. (*Id.*) Ms. Sanchez was categorized as a Level 1 candidate for five of the full-time and/or permanent teaching positions to which she applied, meaning that she was guaranteed an interview for each of those positions. (*Id.*; Doc. No. 24 at 2 ¶¶ 2-3; Doc. No. 32 at 3 ¶¶ 2-3.) The record shows that Ms. Sanchez did not show up for some of these interviews. (Doc. No. 32-3 at 2-3; Doc. No. 34-1 at 1.) In May 2019 or thereabouts, Ms. Sanchez interviewed, as a Level 1 candidate, for a full-time and/or permanent second-grade teaching position at Desert Sage Elementary School ["DSE"]. (*Id.*) Every candidate who interviewed to fill the vacancy at DSE, including Ms. Sanchez, met the minimum qualifications for the position. (Doc. No. 32-3 at 3-4.) Although Ms. Sanchez performed adequately during her interview, DSE's interview committee chose to hire someone else, who was either White or Hispanic. (*Id.* at 1, 3-4; *see* Doc. No. 34-1 at 1.) Around that same time, Ms. Sanchez also interviewed, as a Level 1 candidate, for a full-time and/or permanent teaching position at Sierra Vista Elementary School ["SVE"]. (Doc. No. 34-1 at 1; *see* Doc. No. 32-4 at 1-3.) Although Ms. Sanchez met the minimum qualifications for the position at SVE, the school's interview

committee determined that she was not "the right candidate" to fill the vacancy. (Doc. No. 32-4

at 1, 4-5.) The vacancy was ultimately filled by a twenty-one-year-old White person. (*Id.* at 7-8;

Doc. No. 34-1 at 1.)

At the end of the 2018-2019 school year, Ms. Sanchez sent an email to Mr. Beeman and

Ms. Baldwin, in which she requested clarification as to why she had not been hired for non-INR

teaching positions. (Doc. No. 32-5 at 7.) The substance of that email read:

> I was hired to teach at [SVE] with the [INR] contract for this 2018-2019 school
> year. I interviewed for a 4th grade position at Prairie Winds, and I interviewed for
> 1st grade positions at Cedar Ridge and [SVE] respectively. Yesterday, I had a
> number of parents express disappointment at the fact that I would not be teaching
> at [SVE] next year, and question why was [sic] not selected for the 1st grade
> position. I told them that I did not know why I was not selected for next year. I
> would like to better understand why I was not selected for any of these positions.
>
> Was I disqualified as a teaching candidate for any particular reason? Did the
> selected candidate have more teaching experience? Prairie Winds stated via text
> that a "Level 2" candidate was selected. Does [PCSD] not give preference to current
> [PCSD] employees? Is there some kind of personal bias against me personally?
> Please provide me with an updated copy of the [PCSD] hiring policy to provide
> added information to help me understand the [PCSD] hiring policy and procedures.
>
> Additionally, I would like to request a meeting to discuss this matter. I enjoy
> teaching and working with students, family & faculties to continue to develop
> productive members of a civilized society. I have invested my whole life in
> becoming a career educator, and I am good at it. Please let me know if you have
> any kind of balanced verifiable documented and validated true information that
> proves that I am not an "effective-highly effective" [sic] teacher for any reason. I
> would be glad to answer any questions that you may have regarding any aspect of
> my last twenty years as an educator. Changing careers is not an option, and
> retirement is not an option for at least 11-15 years, if I feel the need to retire at that
> time.

(*Id.*) Ms. Sanchez later testified that her question in the email regarding PCSD's "hiring policy

and procedures" was intended to impliedly convey a complaint about age and race

discrimination. (Doc. No. 32-2 at 5-6.) The District did not understand the email to be conveying

such a complaint. (Doc. No. 24-1 at 7; Doc. No. 24-7 at 2.)

On September 3, 2019, Ms. Sanchez sent an email to Mr. Beeman, Ms. Baldwin, and

PCSD Assistant Superintendent, Ginger Andenucio, titled "another request for information

regarding hiring policy and procedure." (Doc. No. 24-6 at 18.) The email read, in relevant part,

as follows:

> Since 2017, I have been sending emails requesting more clear information and a meeting to discuss the hiring policy and procedure for [PCSD]. . . . For the 2017-2018 school year most of my requests were ignored. Finally, last September 2018, I was granted a meeting with Mr. Beeman[.] . . . During that meeting, I was still not provided with any printed materials regarding the hiring policy and procedure for teachers in [PCSD]. I was assured that there was "no black cloud" hanging over my head[]. . . . No clear explanation was given regarding my complete lack of previous opportunities to interview for any job postings for the 2017-2018 school year. Not long after the September 2018 meeting, I was finally called to interview for 2018-2019 INR Kindergarten teaching position at SVE.

> I am very grateful that I was offered the teaching position, and I was very hopeful that I would be able to secure a teaching position for the 2019-2020 school year[.] . . . Once again that did not happen even though I received four letters of recommendation and my last three RANDA ratings have been *Effective*, *Highly Effective*, and *Effective*, respectively. I requested the reasons for not being selected for any one of the positions for which I interviewed. I was provided truly subjective answers. <u>More importantly, I totally disagree with one reason that stated "*Lack of understanding of classroom/building expectations (i.e., progress monitoring)*</u>" **For this reason, I would like to know if it is possible to voice record any future interviews?** Also, I would like to know if the selected candidates had more [] or equal teaching experience than I do overall and in that particular grade? Did the selected candidates have equal or better RANDA scores than my scores? Were the selected candidates existing employees of [PCSD]?

> Does the hiring policy and procedure of [PCSD] allow for a teaching candidate to be selected based primarily on the personal preference of the interview committee? **I do have a few more serious questions and concerns about [PCSD] hiring practices in regard to me in particular.** . . . I am very disappointed at your lack of empathy. I love teaching and helping students. . . . Please let me know if there is any added information that you can provide to help me better interpret and

> understand this whole matter? I greatly appreciate your time and attention to this email. I look forward to your reply. Thank you.

(*Id.* (emphasis in original).)

On November 11, 2019, Ms. Sanchez sent another email to Mr. Beeman, asking "where to locate the statistical data" collected by the Equal Employment Opportunity Commission ["EEOC"] relating to the "gender and race/ethnicity" of PCSD employees. (Doc. No. 32-5 at 8.) One month after sending that email, in December 2019, PCSD hired Ms. Sanchez to work as a part-time, temporary English Language Learning ["ELL"] teacher for the remainder of the 2019-2020 school year. (Doc. No. 24 at 4 ¶ 12; Doc. No. 32 at 4 ¶ 12.) Within weeks of starting the position, on January 14, 2020, Ms. Sanchez filed a formal charge of employment discrimination with the EEOC. (Doc. No. 24 at 5 ¶ 15; Doc. No. 32 at 4 ¶ 15.)

After filing her EEOC charge, Ms. Sanchez continued to work for the District, as an ELL teacher, until the end of the school year. (Doc. No. 24-6 at 4-5.) For the 2020-2021 school year, Ms. Sanchez was hired for a full-time and/or permanent teaching position at a PCSD elementary school. (*Id.* at 5-7; Doc. No. 24 at 4 ¶ 12; Doc. No. 32 at 4 ¶ 12.) Shortly after starting that position, in September 2020 or thereabouts, PCSD switched to remote classroom instruction, on account of the COVID-19 coronavirus pandemic. (*Id.*) Apparently for that reason, Ms. Sanchez quit her job a few days later. (*Id.*) Since resigning, Ms. Sanchez has continued to obtain work as a substitute teacher at PCSD schools, up through the filing of this lawsuit. (*Id.*)

## II.   Procedural History

On May 24, 2021, after receiving notice of her right to sue from the EEOC, Ms. Sanchez commenced this federal action. (Doc. No. 1.) In her operative pleading, Ms. Sanchez asserts six claims for relief: (1) Title VII race discrimination; (2) Title VII retaliation; (3) ADEA age

discrimination; (4) ADEA retaliation; (5) CADA discrimination; and (6) CADA retaliation. (Doc. No. 6 at 8-13 ¶¶ 36-73.) At the close of discovery, on May 20, 2022, PCSD moved for summary judgment on all of Ms. Sanchez's claims. (Doc. No. 32.)

## STANDARD OF REVIEW

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case. *Celotex*, 477 U.S. at 325. "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works, Inc. v. City & Cnty. of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994) (citing *Celotex*, 477 U.S. at 325). The nonmoving party may not rest solely on the allegations in the pleadings, but instead, must designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324; *see also* Fed. R. Civ. P. 56(c).

"A 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986)). Whether there is a genuine dispute as to a material fact depends upon "whether the evidence presents a sufficient disagreement to require submission to a jury," or conversely, whether the evidence "is so one-sided that one party must prevail as a matter of law. *Carey v. U.S. Postal Serv.*, 812 F.2d 621, 623 (quoting *Anderson*, 477 U.S. at 251-52). A disputed fact is "material" if "under the substantive law it is essential to the proper disposition of the claim."

*Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir.1998) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (citing *Anderson*, 477 U.S. at 248). "Where the record taken as a whole could not lead a rational trier of fact to find for the [nonmovant], there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

In evaluating a motion for summary judgment, a court may consider admissible evidence only. *Johnson v. Weld Cnty.*, 594 F.3d 1202, 1209–10 (10th Cir. 2010). The factual record and reasonable inferences therefrom are viewed in the light most favorable to the party opposing summary judgment. *Concrete Works*, 36 F.3d at 1517. However, this standard does not require the Court to make unreasonable inferences in favor of the nonmoving party. *Carney v. City & Cnty. of Denver*, 534 F.3d 1269, 1276 (10th Cir. 2008). The nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case. *Hulsey v. Kmart, Inc.*, 43 F.3d 555, 557 (10th Cir. 1994).

## ANALYSIS

### I.      Relevant Background Law

Title VII makes it is unlawful for an employer "to fail or refuse to hire . . . any individual, or otherwise to discriminate against any individual with respect to [their] compensation, terms, conditions, or privileges of employment, because of such individual's race[.]" 42 U.S.C. § 2000(e)-2(a). In addition, pursuant to 42 U.S.C. § 2000e-3(a), it is unlawful "for an employer to

discriminate against any of [its] employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title VII]."

The ADEA prohibits employers from discriminating against any individual over forty "with respect to [their] compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1); *see also id.* § 631(a) ("The prohibitions in this chapter shall be limited to individuals who are at least 40 years of age."). The ADEA also makes it unlawful for employers to discriminate against employees who oppose age discrimination. *Id.* § 623(d).

CADA, which parallels federal anti-discrimination statutes like Title VII and the ADEA, prohibits employers from "refus[ing] to hire," "discharg[ing]," "promot[ing] or demot[ing]," or "discriminat[ing] in matters of compensation, terms, conditions, or privileges of employment against any individual otherwise qualified because of," among other things, the individual's race or age. Colo. Rev. Stat. § 24-34-402(1)(a). CADA further prohibits "any person, whether or not an employer," from "discriminat[ing] against any person because such person has opposed any practice made a discriminatory or an unfair employment practice by [CADA]." *Id.* § 24-34-402(e)(IV).

Claims of employment discrimination or retaliation—whether under Title VII, the ADEA, or CADA—can be established via direct or circumstantial evidence. *See, e.g.*, *Riser v. QEP Energy*, 776 F.3d 1191, 1199 (10th Cir. 2015); *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 & n.3 (10th Cir. 2012); *see also Johnson*, 594 F.3d at 1219 n.11 ("Colorado and federal law apply the same standards to discrimination [and retaliation] claims."). If a plaintiff relies on

circumstantial evidence, as Ms. Sanchez does here,[4] her claims are analyzed under the

*McDonnell Douglas* burden-shifting framework. *Singh v. Cordle*, 936 F.3d 1022, 1037 (10th Cir.

2019) (citing *Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 627 (10th Cir. 2012)); *see*

*Adkins v. United Food & Com. Workers Int'l Union, Local 7*, 16 F. App'x 855, 859 (10th Cir.

2001) ("Ms. Adkin's claims under the ADEA, Title VII, and [CADA] are analyzed under the

same three-part framework established for employment discrimination claims."). Under this

framework, the plaintiff has the initial burden of making a *prima facie* case. *Singh*, 936 F.3d at

1037 (citing *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 969-70 (10th Cir. 2017)). If she

does so, the burden then shifts to the employer to articulate a legitimate, non-discriminatory

reason for the adverse employment action. *Id.* (quoting *Daniels*, 701 F.3d at 627). Once such a

showing has been made, the burden shifts back to the plaintiff to prove that the employer's

proffered reason is a pretext. *Id.* (quoting *Daniels*, 701 F.3d at 627).

## II.     The Discrimination Claims

Ms. Sanchez alleges that, as the result of age-based and race-based discrimination, she

was not selected for full-time and/or permanent teaching positions to which she applied over the

course of several years. (Doc. No. 6 at 8-12 ¶¶ 36-43, 49-57, 63-67.) PCSD moves for summary

judgment on these claims, arguing only that Ms. Sanchez has failed to make out a *prima facie*

case of age or race discrimination. (Doc. No. 24 at 6-12.)

---

[4] "Direct evidence is evidence, which if believed, proves the existence of a fact in issue without inference or presumption." *Cruz v. Farmers Ins. Exchange*, 42 F.4th 1205, 1216 (10th Cir. 2022) (quoting *Vaughn v. Epworth Villa*, 537 F.3d 1147, 1154 (10th Cir. 2008)). In this case, Ms. Sanchez does not identify, nor does the record contain, any direct evidence of discrimination or retaliation. *See Ford v. Jackson Nat'l Life Ins. Co.*, 45 F.4th 1202, 1213 (10th Cir. 2022) (stating that direct evidence of employment discrimination "is usually impossible to obtain").

### A. *Prima Facie* Case

"A prima facie case generally requires a plaintiff to show, by a preponderance of the evidence, that she is a member of a protected class, she suffered an adverse employment action, and the challenged action occurred under circumstances giving rise to an inference of discrimination." *Bennett v. Windstream Commc'ns, Inc.*, 792 F.3d 1261, 1266 (10th Cir. 2015) (citing *EEOC v. PVNF, LLC*, 487 F.3d 790, 800 (10th Cir. 2007)). To establish a *prima facie* case of discrimination based on a failure to hire,[5] Ms. Sanchez must demonstrate that: (1) she belongs to a protected class; (2) she applied for an available position for which she was qualified; and (3) she was rejected under circumstances which give rise to an inference of discrimination. *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1216 (10th Cir. 2013) (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)); *accord Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1226 (10th Cir. 2000); *see also Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005) ("[T]he articulation of a plaintiff's prima facie case may well vary, depending on the context of the claim and the nature of the adverse employment action alleged.").

In its Motion for Summary Judgment, PCSD does not dispute that Ms. Sanchez has satisfied the first two elements of her *prima facie* cases of age and race discrimination. (Doc. No. 24 at 7.) As to the first element, Ms. Sanchez was fifty-six-years old when she filed this lawsuit, and she identifies and presents as mixed race of Hispanic, Native American, and Caucasian. (Doc. No. 6 at 2 ¶ 2; Doc. No. 24 at 4 ¶ 11.) As to the second element, the record shows that Ms.

---

[5] There appears to be some dispute as to whether Ms. Sanchez is alleging discrimination based on a failure to hire, or a failure to promote. (*See* Doc. No. 34 at 7-8.) However, the distinction is immaterial, as the same standard applies to both types of claims. *See, e.g.*, *Drake v. City of Fort Collins*, 927 F.2d 1156, 1159-60 (10th Cir. 1991); *Lee v. Denver Pub. Schs.*, No. 20-cv-1989-WJM-MEH, 2021 WL 1172634, at *3 n.1 (D. Colo. Mar. 29, 2021).

Sanchez met the minimum qualifications and applied for multiple full-time and/or permanent teaching vacancies at PCSD schools. (Doc. No. 6 at 7 ¶¶ 29-30; Doc. No. 11 at 6 ¶¶ 29-30; Doc. No. 32-2 at 1; Doc. No. 32-3 at 3-4; Doc. No. 32-4 at 4-5.) However, PCSD argues that Ms. Sanchez cannot satisfy the final element of her *prima facie* case, because it is undisputed that "Ms. Sanchez was hired for positions by the District nearly every year," and also that "the District hired numerous Hispanic teachers (and teachers over the age of 60)" to fill at least some of the full-time and/or permanent teaching vacancies to which Ms. Sanchez applied. (Doc. No. 24 at 7.)

"The critical prima facie inquiry in all cases is whether the plaintiff has demonstrated that the adverse employment action occurred under circumstances which give rise to an inference of unlawful discrimination." *DePaula*, 859 F.3d at 970 (citing *Kendrick*, 220 F.3d at 1227). Only a "small amount of proof [is] necessary to create an inference of discrimination." *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 539 (10th Cir. 2014) (quoting *Orr v. City of Albuquerque*, 417 F.3d 1144, 1149 (10th Cir. 2005)); *see Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1216 (10th Cir. 2013) (stating that the plaintiff's burden at the *prima facie* stage "is not onerous"). "A prima facie case raises an inference of discrimination by eliminating the most common nondiscriminatory reasons for the defendant's conduct." *Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1134 (10th Cir. 2004) (citing *Burdine*, 450 U.S. at 254).

In the failure to hire context, if a qualified employee who is a member of a historically oppressed racial group is not hired for a job in which a vacancy exists, the failure alone is sufficient to raise an inference of race discrimination at the *prima facie* stage. *Perry v. Woodward*, 199 F.3d 1126, 1139 (10th Cir. 1999) (citing *Int'l Brotherhood of Teamsters v.*

*United States*, 431 U.S. 324, 358 n.44 (1977)); *see also Kendrick*, 220 F.3d at 1227-29. For age-based discrimination claims, a plaintiff who falls within the protected age group can satisfy the third element of her *prima facie* case by showing that the position at issue was filled by someone who was younger, though not necessarily under the age of forty. *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312 (1996) ("Because it lacks probative value, the fact that an ADEA plaintiff was replaced by someone outside the protected class is not a proper element of the *McDonnell Douglas* prima facie case.").

Here, the summary judgment record contains evidence showing that Ms. Sanchez falls within a protected racial group (Doc. No. 24 at 4 ¶ 11; Doc. No. 32 at 4 ¶ 11); that she applied for certain full-time and/or permanent teaching positions that were available at PCSD schools (Doc. No. 6 at 7 ¶ 29; Doc. No. 11 at 6 ¶ 29); that she was qualified for all of those positions (Doc. No. 32-2 at 1); and that at least some of those positions were filled by other job applicants outside of Ms. Sanchez's protected racial group (Doc. No. 34-1 at 1). Accordingly, Ms. Sanchez has satisfied her initial burden to make out a *prima facie* case of race discrimination. *See Sasser v. Salt Lake City Corp.*, 772 F. App'x 651, 658 (10th Cir. 2019) (finding *prima facie* case of racially discriminatory failure to hire to be met, where plaintiff was a member of a protected class and "at the very least[] minimally qualified" for an advertised position that went to a white woman); *Barnett v. Boeing Co.*, 173 F. Supp. 2d 1125, 1132 (D. Kan. 2001) (finding plaintiff satisfied his *prima facie* burden with respect to a race-based failure to hire claim, where plaintiff adduced evidence that he was an American Indian, that he was qualified for the employment positions to which he applied, and that those positions were filled by other job applicants); *see also Lee v. Denver Pub. Schs.*, No. 20-cv-1989-WJM-MEH, 2021 WL 1172634, at *3 (D. Colo.

Mar. 29, 2021) ("By alleging that she was rejected despite her qualifications and that the position was filled by a White applicant, Lee has met her burden of plausibly alleging a claim for race discrimination.").

Ms. Sanchez has also met her initial burden to make out a *prima facie* case of age discrimination. The summary judgment record contains evidence that Ms. Sanchez falls within a protected age class (Doc. No. 24 at 4 ¶ 11; Doc. No. 32 at 4 ¶ 11); that she was qualified for certain full-time and/or permanent teaching vacancies (Doc. No. 32-4 at 1-6; Doc. No. 34-1 at 1); and that at least one of those vacancies was filled by an individual who was several decades younger than her. (Doc. No. 32-4 at 7-8; Doc. No. 34-1 at 1.) Accordingly, Ms. Sanchez has established a *prima facie* case of age discrimination. *See Flanders v. Enron Corp.*, 49 F. Supp. 2d 1276, 1280 (D. Kan. 1999) (holding evidence sufficient to establish a *prima facie* case of age discrimination, where the plaintiff "applied for the position, she was within the protected age class, she was not hired although she was qualified, and the person defendant hired appeared to be more than ten years younger than plaintiff"); *see also Maughan v. Alaska Airlines, Inc.*, 281 F. App'x 803, 806 (10th Cir. 2008) (holding plaintiff who was over the age of sixty at the time of his termination established *prima facie* case of age discrimination by presenting evidence that he was replaced by someone who was forty-years old); *Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1168 (10th Cir. 1998) (concluding plaintiffs satisfied *prima facie* burden by demonstrating that they were terminated while "at least one" younger employee was retained).

### B. Legitimate, Non-Discriminatory Reason

Because Ms. Sanchez has met her *prima facie* burden, the burden shifts to PCSD to produce evidence showing a legitimate, non-discriminatory motive for its actions.   PCSD's

burden at this stage is "one of production, not persuasion." *DePaula*, 859 F.3d at 970 (quoting

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)). It need only "proffer

non-discriminatory reasons, not prove them." *Harper v. Dep't of Human Servs., Colo. Mental*

*Health Inst. at Pueblo*, 932 F. Supp. 2d 1217, 1226 (D. Colo. 2013) (citing *Zamora v. Elite*

*Logistics, Inc.*, 478 F.3d 1160, 1165-66 (10th Cir. 2007)) (describing the defendant's burden at

this stage as "exceedingly light"). A defendant may satisfy its burden merely by producing any

evidence "which, *taken as true*, would *permit* the conclusion that there was a nondiscriminatory

reason for the adverse action." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)

(emphasis in original). "The defendant need not persuade the court that it was actually motivated

by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact

as to whether it discriminated against the plaintiff." *Burdine*, 450 U.S. at 254-55 (footnote

omitted).

Ms. Sanchez argues, in her Response, that PCSD has failed to proffer a legitimate, non-

discriminatory reason as to why she was passed over for numerous full-time and/or permanent

teaching positions to which she applied and was qualified over the course of several years. (Doc.

No. 32 at 10.) PCSD, for its part, does not identify a legitimate, non-discriminatory reason for its

employment practices, either in its Motion for Summary Judgment or in its Reply.[6] (*See*

*generally* Doc. Nos. 24, 34.) Instead, PCSD has opted to rely solely on the alleged inability of

Ms. Sanchez to establish a *prima facie* case of age or race discrimination. As such, the Court has

---

[6] In support of its Motion for Summary Judgment, PCSD has submitted evidence regarding its general hiring policies and practices. (Doc. No. 24-1.) This evidence does not satisfy PCSD's very light production burden because it is evidence only of the circumstances surrounding its general hiring practices, but it is not evidence of legitimate, non-discriminatory reasons for selecting other candidates over Ms. Sanchez.

no occasion to engage in a meaningful pretext analysis. *See Kademiya v. Hunter Douglas Window Fashions, Inc.*, No. 05-cv-00135-PSF-CBS, 2006 WL 1991754, at *5 (D. Colo. July 14, 2006) ("[D]efendant does not articulate any legitimate, nondiscriminatory reason for the differences in the pay reasons between plaintiff and Mr. Semantel. . . . Accordingly, on this record plaintiff need not come forward with any evidence of pretext, as there is nothing to challenge."). The Court holds only that Ms. Sanchez has satisfied the rather minimal *prima facie* threshold, and that she has shifted the burden of production to PCSD. No opinion is expressed as to whether this case is otherwise amenable to resolution at the summary judgment stage. *See Gordon v. The Bay Area Air Quality Mgmt. Dist.*, No. C08-3630 BZ, 2010 WL 147953, at *3 (N.D. Cal. Jan. 12, 2010) (holding defendant failed to carry its burden at the second stage of the *McDonnell Douglas* analysis and denying summary judgment for that reason, where defendant proffered no evidence explaining why it hired another person over the plaintiff); *see also Nguyen v. Metro. Transit Auth. of Harris Cnty., Tex.*, No. H-12-2184, 2013 WL 4506001, at *3 (S.D. Tex. Aug. 22, 2013) (denying defendant's motion for summary judgment on retaliation claims, where defendant provided no explanation for its adverse actions).

In sum, the record of evidence in this case is sufficient to enable a reasonable trier of fact to infer that PCSD's hiring decisions with respect to Ms. Sanchez were the product of unlawful age and race discrimination. Because PCSD makes no attempt to explain its reasons for hiring job applicants outside of Ms. Sanchez's protected race and age groups rather than Ms. Sanchez, PCSD is not entitled to summary judgment on any of Ms. Sanchez's discrimination claims. *Singh*, 936 F.3d at 1037. Accordingly, PCSD's Motion for Summary Judgment on Ms. Sanchez's ADEA, Title VII, and CADA discrimination claims is **DENIED**.

**III.     The Retaliation Claims**

Ms. Sanchez also alleges that PCSD unlawfully retaliated against her for making

complaints about discrimination. (Doc. No. 6 at 10-11, 13 ¶¶ 46, 59, 70.) To establish a *prima*

*facie* case of retaliation, Ms. Sanchez must show: (1) her engagement in protected opposition to

discrimination; (2) a "materially" adverse employment action; and (3) a causal connection

between the protected activity and the materially adverse employment action. *Daniels*, 701 F.3d

at 638 (citing *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1202 (10th Cir. 2008)).

**A. Protected Activity**

With respect to the first element of her *prima facie* case, Ms. Sanchez asserts four

instances of protected opposition to discrimination: (1) the September 18, 2017 email to Mr.

Beeman, in which Ms. Sanchez asked whether the District was an "Equal Opportunity

Employer;" (2) the May 30, 2019 email to Mr. Beeman and Ms. Baldwin, in which Ms. Sanchez

requested an explanation as to why she had not been hired for non-INR teaching positions and

asked whether there was "some kind of bias against me personally;" (3) the November 11, 2019

email to Mr. Beeman, in which Ms. Sanchez demanded to know the District's hiring data for its

teachers; and (4) the formal charge of discrimination, which Ms. Sanchez filed with the EEOC

on January 14, 2020. (Doc. No. 32 at 6-7 ¶¶ 29-33.) In its Motion for Summary Judgment, PCSD

argues, first, that none of Ms. Sanchez's emails constitute protected activity, because they lack

sufficient detail "to imply that she was concerned about potential discrimination." (Doc. No. 24

at 9.)

Opposition to an employer's conduct is only "protected" if it opposes a practice made

unlawful by the anti-discrimination statutes at issue. *Petersen v. Utah Dep't of Corr.*, 301 F.3d

1182, 1188 (10th Cir. 2002); *Hinds*, 523 F.3d at 1203. "Protected opposition can range from filing formal charges to voicing informal complaints to superiors." *Hansen v. SkyWest Airlines*, 844 F.3d 914, 926 (10th Cir. 2016) (citation omitted); *see Crawford v. Metro. Gov't of Nashville & Davidson Cnty,*, 555 U.S. 271, 276 (2009) ("When an employee communicates to her employer a belief that the employer has engaged in a form of employment discrimination, that communication virtually always constitutes the employee's opposition to the activity.") (alterations omitted). "Although no magic words are required, to qualify as protected opposition the employee must convey to the employer his or her concern that the employer has engaged in a practice made unlawful by the ADEA [or Title VII]." *Hinds*, 523 F.3d at 1203. "[G]eneralized employment complaints" do not suffice. *Id.* at 1202-03.

### 1. September 2017 Email

In her September 2017 email to Mr. Beeman, Ms. Sanchez first expresses dissatisfaction with the fact that she had been selected for only one interview in the past twelve months. (Doc. No. 32-5 at 6.) She then states, "I know that [PCSD] is supposed to be an 'Equal Opportunity Employer,' so something is wrong." (*Id.*) Ms. Sanchez then goes on to remark, "I don't know if I am not getting a positive recommendation from Mrs. Vincent, or if there is some other explanation for my lack of teaching opportunities[.]" (*Id.*) At the end of the email, Ms. Sanchez asks to meet with Mr. Beeman "to discuss this matter and identify any problems with my applications, credentials, work history, references, or anything else that is making it difficult to continue my career in education." (*Id.*)

Ms. Sanchez argues that this email "strongly infers she may be the victim of illegal discrimination," particularly given its reference to PCSD being an "Equal Opportunity

Employer." (Doc. No. 32 at 6 ¶ 29.) However, as Ms. Sanchez admitted during her deposition, the email does not mention discrimination.[7] (Doc. No. 24-6 at 11.) Nor does the email even obliquely allude Ms. Sanchez's age or race. (*See generally* Doc. No. 32-5 at 6.) Ms. Sanchez's vague references to the EEOC, to "some other explanation" for her lack of interviews, and to "anything else that is making it difficult" to advance in her career, even construed together in Ms. Sanchez's favor, fall short of raising a triable issue of fact as to whether Ms. Sanchez was conveying concerns about age or race discrimination. *See Hinds*, 523 F.3d at 1203 n.3 ("[A] vague reference to discrimination and harassment without any indication that this misconduct was motivated by race (or any other category protected by Title VII) does not constitute protected activity and will not support a retaliation claim."); *Lucas v. Office of Colo. State Pub. Def.*, 705 F. App'x 700, 706 (10th Cir. 2017) (finding a plaintiff's verbal complaints to his employer regarding "unfair treatment" and his threats "to complain to the EEOC about a hostile work environment" to be inadequate, for purposes of establishing a *prima facie* case of retaliation, because nothing in the record suggested that the plaintiff complained to his employer about race or gender discrimination, specifically); *Oldridge v. City of Wichita, Kan.*, No. 18-1243-JWB, 2022 WL 1471369, at *11 (D. Kan. May 10, 2022) (holding plaintiff's email to her employer referencing "equal opportunity," "disparities," and "fairness" regarding the process, without more, did not constitute protected activity under Title VII); *Dean v. Comp. Sci. Corp.*,

---

[7] In her Response, Ms. Sanchez appears to suggest that Mr. Beeman "admitted" during his own deposition that he understood the email to be a complaint of unlawful discrimination. (Doc. No. 32 at 6 ¶ 29 (citing Doc. No. 32-5).) However, the evidence referenced by Ms. Sanchez shows only that Mr. Beeman admitted to receiving the September 2017 email. (Doc. No. 32-5 at 5 ("I read all my e-mails. So obviously, I've seen this email.").) This evidence does not create a dispute material to Ms. Sanchez's retaliation claims.

No. 07-cv-00823-PAB-KMT, 2009 WL 1394445, at *2 (D. Colo. May 19, 2009) (holding

plaintiff's email, in which she identified herself as "a single black mother" and stated that she

was "making a complaint regarding 'Discrimination and Harassment' against Triplett and

Johnson for harassing her at work," did not constitute protected activity because "nowhere in this

email does the plaintiff claim that such harassment is due to race or sex discrimination").

Accordingly, Ms. Sanchez has failed to raise a triable issue of fact as to whether the September

2017 email constituted protected activity.

### 2. May 2019 Email

In her May 2019 email to Mr. Beeman and Ms. Baldwin, Ms. Sanchez expresses ongoing

frustration with her lack of interviews for certain teaching positions. (Doc. No. 32-5 at 7.) She

states that she "would like to better understand why I was not selected for any of these teaching

positions." (*Id.*) She then asks whether she was "disqualified as a teaching candidate for any

particular reason," or whether there was "some kind of personal bias against [her] personally."

(*Id.*) In the final paragraphs of the email, Ms. Sanchez requests "an updated copy of the [PCSD]

hiring policy" to help her "understand the [PCSD] hiring policy and procedures," as well as a

meeting "to discuss this matter." (*Id.*)

Viewing the evidence and drawing all reasonable inferences therefrom in Ms. Sanchez's

favor, no reasonable juror could conclude that Ms. Sanchez was engaging in protected opposition

to discrimination when she sent the May 2019 email. The email does not mention age or race

discrimination, or any other employment practice made unlawful by the ADEA, Title VII, or

CADA. Ms. Sanchez's question regarding "personal bias," without any reference to Ms.

Sanchez's age or race, is insufficient to constitute opposition to an unlawful employment

practice. *See Lamb v. Montrose Cnty. Sheriff's Office*, No. 19-1275, 2022 WL 487105, at *4 (10th Cir. Feb. 17, 2022) (To qualify as protected activity, "there must be 'some perceptible connection to the employer's alleged illegal employment practice,' and 'it must be possible to discern from the context of the statement that the employee opposes an unlawful employment practice.'"); *see Oldridge*, 2022 WL 1471369, at *9 (holding plaintiff's email asking how a survey would "filter out personal or other bias from respondents" was not protected activity, because it was not possible to discern from the communication that plaintiff was referring specifically to unlawful gender discrimination as opposed to "any type of bias").

### 3. November 2019 Email

Finally, in her November 2019 email to Mr. Beeman, Ms. Sanchez asks for the location of demographic data relating to the District's hiring practices. (Doc. No. 32-5 at 8.) Ms. Sanchez claims that she sent this email because she was "gravely concerned about potential ethic, racial, or age discrimination." (Doc. No. 32 at 6 ¶ 31.) But nowhere in the email does Ms. Sanchez articulate concerns about age or race discrimination. (*See generally* Doc. No. 32-5 at 8.) Drawing all reasonable inferences in Ms. Sanchez's favor, no reasonable juror could conclude that Ms. Sanchez was making a complaint about age or race discrimination when she requested assistance locating PCSD's publicly-available hiring data. Accordingly, Ms. Sanchez has failed to raise a triable issue of fact as to whether the November 2019 email constitutes protected activity, either.[8]

---

[8] Even assuming Ms. Sanchez could demonstrate that she engaged in protected opposition to discrimination by sending emails, PCSD has produced uncontroverted evidence to show that it did not understand *any* of Ms. Sanchez's emails to imply that she was concerned about discrimination. (Doc. No. 24-1 at 7; Doc. No. 24-7 at 2.) "Unless an employer knows that an employee is engaging in protected activity, it cannot retaliate against that employee *because* of the protected conduct, as

**B. Adverse Employment Action/Causation**

Ms. Sanchez also alleges that PCSD retaliated against her for filing of charge of discrimination with the EEOC. (Doc. No. 6 at 10-11 ¶¶ 46, 59.) While conceding that Ms. Sanchez's filing of an EEOC charge satisfies the first element of her *prima facie* case, PCSD argues that Ms. Sanchez has failed to adduce adequate evidence showing that she was subject to any materially adverse action for doing so. (Doc. No. 24 at 8-9.) The Court agrees.

To satisfy her *prima facie* burden, Ms. Sanchez must demonstrate a causal link between a protected activity and a materially adverse employment action. *Daniels*, 701 F.3d at 638. In the retaliation context, a "materially adverse action" is one that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Hiatt v. Colo. Seminary*, 858 F.3d 1307, 1316 (10th Cir. 2017) (quoting *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006)). To establish a causal link between protected activity and materially adverse action, Ms. Sanchez must show "that the individual who took adverse action against [her] knew of [her] protected opposition." *Zokari v. Gates*, 561 F.3d 1076, 1081 (10th Cir. 2009) (citing *Williams v. Rice*, 983 F.2d 177, 181 (10th Cir. 1993)).

Here, Ms. Sanchez identifies the following materially adverse action purportedly taken by PCSD in retaliation for her filing an EEOC charge: "During this time frame, Ms. Sanchez has been denied her application(s) for an array of full-time positions for which she was qualified."

---

required by statute." *Jones v. UPS, Inc.*, 502 F.3d 1176, 1195 (10th Cir. 2007) (citations omitted). As such, Ms. Sanchez has failed to establish a causal connection between her emails and any adverse employment action. *See Hankishiyev v. ARUP Lab'ys*, 732 F. App'x 673, 677 (10th Cir. 2018) (holding plaintiff failed to establish *prima facie* case of retaliation, where plaintiff produced no evidence showing that his employer "interpreted his comments as protected opposition to discrimination").

(Doc. No. 32 at 11.) However, the evidence does not reflect a causal connection between her EEOC filing, which occurred on January 14, 2020, and the denial of her job applications. Indeed, there is no evidence that Ms. Sanchez was rejected for *any* teaching positions after she filed the EEOC charge. *See Piercy v. Maketa*, 480 F.3d 1192, 1198 (10th Cir. 2007) ("A retaliatory motive may be inferred when an adverse action closely follows protected activity. However, unless the [adverse action] is *very closely* connected in time to the protected activity, the plaintiff must rely on additional evidence beyond temporal proximity to establish causation."). The opposite is true. There is evidence in the record that Ms. Sanchez continued to work for the District as an ELL teacher in 2020, and then hired her for a full-time teaching position at a PCSD elementary school the following school year. (Doc. No. 24 at 4 ¶ 12; Doc. No. 32 at 4 ¶ 12; *see also* Doc. No. 24-6 at 4-7.) The Court also has not been presented with any evidence that decisionmakers rejected Ms. Sanchez's applications with actual knowledge that she had filed an EEOC charge. *Zokari*, 561 F.3d at 1081.

On this record, then, Ms. Sanchez has failed to raise a genuine issue of material fact regarding whether she suffered a materially adverse action because of any protected activity. As such, Ms. Sanchez cannot demonstrate a *prima facie* case of retaliation. *Daniels*, 701 F.3d at 638. Therefore, PCSD's Motion for Summary Judgment on Ms. Sanchez's retaliation claims is **GRANTED**.

## CONCLUSION

For the foregoing reasons, **IT IS ORDERED THAT**:

(1) The "Defendant's Motion for Summary Judgment" (Doc. No. 24) is **GRANTED in part, and DENIED in part**. Specifically, summary judgment is **DENIED** as to Plaintiff's

discrimination claims under the ADEA, Title VII, and CADA, and those claims may

**PROCEED**. Summary judgment is **GRANTED** as to all remaining claims.

**DATED:** March 27, 2023.

BY THE COURT:

Maritza Dominguez Braswell
United States Magistrate Judge